Matter of USA v. Vetri Moving then to United States of America v. Anthony Vetri, Mr. Goldberger. Good morning. Quite a morning you have. Is it still morning? Yeah, it's just about. Thank you. May it please the Court, my name is Peter Goldberger and it's my privilege this morning to represent Anthony Vetri, who was the defendant below. I'd like to reserve two minutes of my time for rebuttal. The cell phone video with government exhibit 603B that was used as critical evidence at trial should have been suppressed because it was seized in violation of Fourth Amendment rights. This case is. I don't want to start by saying this case is at the heart of the Fourth Amendment. This involves a search of a home for an object which we all recognize as a extensive repository of private information. The cell phone. Subject of so much very recent jurisprudence about searches. And within that cell phone, the most private of things to be found in that place or thing, the cell phone, a family video. And it's from in that perspective that I want to look at the whole case. I can't help but observe that. Indeed, it can be characterized as a family video. It's probably not one ordinarily for family viewing, but I like to get your point here. Your reference to this being also a search of the home. And that's true. But the record does support that it was Mr. Vetri's home that was also used really as an office for his purposes. That's true. A home office, a home business. That's not uncommon. No, no. And in response to your comment about the video, we also have to remember this is true in so many Fourth Amendment cases that we look at these things categorically. You never put. You never look at it, say, well, this is criminal in nature, and therefore we look at it differently than we would look at any other video, any other cell phone or any other home. You need to be reminded of that, Mr. Goldberger. I said it because I think it was a strange characterization. And as much as when the agents would have sought the video from within the cell phone, they had no idea whether they were going to find a family video. That's right. So when we look at Fourth Amendment cases, there's always this question of you want to start at the beginning and march step by step through everything that happened until at the end you get to the evidence. And sometimes it makes as much or more sense to start with the evidence and work backwards through all the steps that were taken. And although we typically when we write about Fourth Amendment problems, be it in briefs or in opinions, I think we typically take that start at the beginning and take it through the steps approach. Now, we talk about it orally. It sometimes makes more sense. And I thought it would make more sense here to start at the end and work backwards. That is with the plain view. And I think that might be where your question is pointing a little bit also is how do we get to the picture to the to the video? Doesn't Stabile teach that they can take a quick look? Yeah. For example, you know, they're they're doing a warranted search of someone's computer and let's say the file says wedding photos. Right. I think the teaching of Stabile is that the agents can click on. Obviously, they're not looking for wedding photos in my hypothetical, but they can click on that. And if they see two or three pictures of a normal wedding, then they should get out. Right. But they shouldn't accept at face value the vile definition of wedding photos. So they get to click on it. And when they click on it and they see some criminal activity, then they can just proceed. And Stabile is about opening folders and getting beyond the folder name and to some extent not taking a file name at face value when the file is a document. Right. But Stabile also teaches that as applied to the cell phone. As applied to computers and it's not a cell phone case, but it's a computer case. And the cell phone is a computer, is a mini computer. And it's an and and it's a private communication device. But it's it's it's a unique object. What Stabile teaches is that we have to apply these two hundred year old doctrines, 50 year old doctrines and 70 year old doctrines with factual sensitivity to these new circumstances and new technology. And we don't apply the old rules mechanically in a way that defeats the. Principles and purposes of the of the constitutional protection. Right. Tell us why. Tell us why the the video is contradistinguished from the folder. Exactly what my point was that a video is not a text document. A video is not a document in a folder. So we're how to apply Stabile to the video is itself a new problem. Right. Our suggestion was that the videos are not kept, you know, they may be saved in a file structure similar to the way documents are kept in that. You might go in the cell phone to my photos and then the photos may be grouped either by you or by Apple thinking it's doing you a favor. All the ones that were taken in a certain place are all the ones that appear to be, you know, whatever that whatever Steve Jobs and his people are doing to do your thinking for you. But you don't have to open. They don't open like a document. They don't open like a folder. When you see the video, you're looking at what we call the screenshot, the opening frame of the video. You already know when you look at this video, it is a picture of a three year old sitting at a table eating. But that's like saying you come across a photo album and because of whatever photo is on the outside, you wouldn't take. Let's assume you're authorized to look at document, collect documents and photographs and things that would be relevant to the crime. If the charge is conspiracy, it can be very helpful evidence to have photos of the defendant with co-conspirators, even at family events, for example. So if you were to come across a photo album with with the screenshot on the outside, if there were in the warrant authorization to seize and search the cell phone or seize and search, in this case, the photo album, would you really say that the government's precluded from opening opening it just because of what's on? I think that's the same as the wedding album example that Judge Hartman gave. Right. What does it mean to what is it that you would open? Could you open the collection that appears to be family pictures to see if they are all really family pictures? Openness. And how do you how do you know without running it run that it's not going to pan over to the whole group of co-conspirators? Well, you don't know that for sure. And that's the agent, of course, would love to conduct a general search all the time. But the agent is authorized to search for by this warrant is cell phones and its contents. And I think we know from Stabile that cell phones and its contents cannot mean all of the contents of a cell phone willy nilly. Well, that can't mean that. Then we're going to step back a little bit to to look at what you've termed a plain view argument. I'm not sure I understand how how that argument fits in where you haven't challenged the particularity of the of the search as to the cell phone content to begin with. And the plain the concept of plain view is you are allowed to go in and look at some things, but you come across something you weren't expecting that provides additional evidence. So you're asking us to look at that doctrine as to the the video here. But you haven't made any challenge to the scope of the search of the phone itself on appeal. I thought we had. I thought that was exactly what we're saying with. And this is the one step back. Now we're taking one step back in the three steps that Stabile talks about. The three factors about plain view is what did the warrant authorize a search for the. There is, first of all, no probable cause anywhere in the warrant for no mention of cell phones per se. No particularized mention of the use of similar electronic devices, even as to Anthony Vetri. There's this catch all at the end of the warrant that talks about electronic devices that drug dealers typically use for store for keeping financial records. I understand. But that's that's an argument as to probable cause for the seizure. The initial seizure of a cell phone. But the second argument that is certainly a hot topic in Fourth Amendment law about what parameters might be used for for searches, if that should be ex ante, ex post, whether that's something that magistrate needs to needs to authorize. That that does not make an appearance in your brief. You just you jump to a plain view argument. And I'm not sure I understand how plain view comes into play. If you haven't made a challenge to the scope of the search of the contents of the phone, in contrast to probable cause to seize the phone to begin with. As I said, I thought we had made that argument that that the that what limits the scope of the search of the phone is the authorization of the warrant understood in light of the affidavit. So what could be searched is the contents of the phone for because it's electronic device for anything that may be electronic records of financial transactions. Put more simply, what does a three year old have to do with financial fraud or oxy? Yes. For oxy crimes. Right. Well, but then that's why I get back to the bill, because the bill was a financial case. And then the guy gets caught up in child pornography because they are looking at a place where financial records might be found, although hidden with a false file name. Right. And then why, in this case, wasn't the cell phone a place where the target of the warrant financial drug crimes might be found? The cell phone itself certainly could be such a place. But is a video such a place? In what way is it reasonable to think for any officer to think or anyone to think that you would hide financial records in a one and a half minute video? Wasn't this a video sent between co-conspirators? It was transmitted. Yes. It's an MMS message. It's a textless text message. Yeah. Yeah. So why can't they go after everything between and among co-conspirators, regardless of what it looks like at first blush? I mean, every drug case I've ever seen, they don't they don't say, hey, I'll sell you two kilos of coke. They they use code words, et cetera. And so and they may start with, how's your kid in the conversation? Right. But when you have a video that this stuff that we're not talking about a search for evidence of a conspiracy, including contacts between conspirators. That's not what the warrant authorizes. The warrant authorizes search of the house, including electronic devices for evidence of financial transactions of insurance fraud or drug dealing. And this is not a place which looks like it might be within the cell phone. The videos, particularly the family videos, to be a place where you would find such information. Place and you looked and you found something of evidentiary value like contact between conspirators. That would be something else. I agree with you at first blush. And what I'm what I'm pressing you on, I'm trying to get an understanding of Mr. Goldberger is. Does doesn't Stabile say even things that don't look like they're within the scope of the warrant at first blush allow a quick look? Because if if the doctrine were otherwise, then. We, the judges, the courts would be giving carte blanche to criminal actors to mask their criminal conduct with what would appear to be otherwise innocuous activity. If the quick if the quick look, we say the quick look is the screenshot. If the screen if you're going to take a quick look by pushing the play button, fine. It's a one minute and 40 minute, 40 second. That really what your argument is coming down to it, that it we're talking about. What is an appropriate temporal span here? Because, you know, it strikes me that this is at least somewhat analogous, maybe in terms of its operation, highly analogous to the practice, the principle in law enforcement where hardwires are used, minimalization that when you're listening to a conversation, different technology, audio there. We're talking about video. But when when you are monitoring the hardwire, when you hear something that clearly suggests this is personal in nature, or at least it's not related to the alleged criminal activity that's been set out in the court order that has enabled the hardwire. You've got to minimize. You've got to turn it down. You've got to stop. Is that what you're even aware? Yes, it is. And if there was even whatever question there may be about how much quick look you can do, it wouldn't be one minute and 14 seconds into the video, which is a minute and 40 seconds long. They what they did very obviously was just view every video looking for something that might be of entry value. There was no you can't have had a compliant minimization mindset and have stayed with this video for more than a minute. All right. We'll have you back on rebuttal. Mr. Goldberger, thank you very much. Here from the government. I believe it's still morning. No, it's not. Actually, it's two minutes past. May it please the court. I'm representing the United States in this in this matter. It appears from my colleagues argument that he has narrowed his focus to whether or not the introduction of the video violated the Fourth Amendment. I am prepared to address more broadly the the initial argument that there weren't established probable cause. And if you could start where we left off, it would help me because Mr. Goldberg's point is, look, this video is a minute 40. There's nothing incriminating until a minute 14. So even assuming argue under they had a right to click on this and take a look at it, they should have been out of it within 10 or 20 seconds because it's just, you know, a three year old. Well, my response to that is first, the minimization requirement that your honor referred to is a statutory requirement that's imposed in the wiretap context. And generally, the courts have recognized that two minutes is the reasonable period. They can listen for approximately two minutes before they have to decide that that conversation is not pertinent. Here we have a very short video. What is striking about this video from the from the get go, as soon as you press play, the the he's Mr. Vetri says to his toddler, say hi, Mike. It's a video that is not only being sent to his co-defendant in both the drug conspiracy case and the arsons that have been committed in the same time frame, but he is filming it for him. And also, and I would just note this, that in in searching the contents of Mr. from the time frame of October 2011 through January 2012, were the messages that he sent to Vetri. There were 700 text messages. There was frequent communications. This video was sent to Vandergrift as a text message. And he the other thing that was notable was that the the the messages, the information pertaining to Vandergrift had been transferred from an iPhone four where they were originally generated to his current iPhone five. This said to the agent who was conducting the search, there's something important about his communications with Vandergrift. As I understand it, my my colleague is no longer contending that the 700 text messages that we didn't introduce. Does that mean the rules should be different in a case like this where you've got active communication than in a case like the bill where you've just got somebody's computer sitting on their desk and the agents are going to search the computer? Well, I don't think it necessarily has to be different. I don't think we reach plain view exception. The plain view doctrine is an exception to the warrant requirement. Here we have a warrant that authorizes not only the search of cell phones, but then sets the parameters for that cell phone search, which is exactly your point. Judge Krause said there isn't an argument that somehow or other they exceeded the scope. What are the parameters? The parameters, the cell phone was permitted to be searched and it's in Attachment B. Attachment B identifies 18 categories of types of evidence that would have been generated in the commission of the fraud crimes and the drug trafficking conspiracy. Is that tantamount to saying carte blanche on the cell phone? No, I think what it did was say you can look for these categories of documents in the cell phone. And that's what the district court found. But to Mr. Goldberger's point, if you're looking for financial or drug crimes, you'd be surprised to see a three-year-old. Well, one of the specific categories in the Attachment B, which was not challenged in the district court, and my understanding is it wasn't challenged on appeal, is that they could search for photographs and videos that could evidence commission of the crime. So right off the bat, the agents who are conducting the search and did so very carefully, they used the face sheet of the warrant, they used the Attachment B, which was very detailed. And they see that they can search videos. These are videos sent to his primary co-conspirator during this time frame. That's what I'm driving at. Your argument is it doesn't matter whether it's a three-year-old, the family dog, or grandma in a hospital bed. If the transmission is from co-conspirator to co-conspirator, your argument, as I understand it, is that the agents can have at it. Can review it based on the authority provided by this particular warrant. There might be another situation where that's not true. So what matters to you under this warrant isn't the people involved or the nature of the documents, excuse me, the subject of the video. What matters is the recipient and the candidate, the people involved in the communication. That's correct, Your Honor. And also, this is where Stabile is relevant, that something that is completely innocent-looking, the screenshot may have just depicted the toddler daughter. But once you press that video and it says, say hi to Mike, and given the time frame, it was a short video the agent was entitled to. You can view that video to see if there was any evidence that related to the commission of the crimes. So I believe that the video was covered by the warrant, and it was entirely reasonable. As the agent testified at the suppression hearing, there were some categories or some pieces of evidence, potential evidence, that you could look at and immediately determine that it wasn't relevant. For example, a photograph. You can tell by just looking at a thumbnail of a photograph whether it's relevant. But with the video, there was no way of knowing what was in that video. It could have been he had his daughter talk about proceeds and money and some other aspect of the drug trafficking crime. Or arson. I mean, the fact that the daughter is referencing a murder in this video means that they're recruiting another kid. I'm not saying talk about it. He could have talked about it. The other thing was, this is a communication. He made this video purposefully to send it to Vandegriff. It's not like just sending a video of my toddler daughter because it's cute. There's something, as soon as you open it and you see, say hi to Mike, there's at least a strong suspicion that this has something to do with Vandegriff. Related to their criminal activity together. The government's position, even after Riley, is that there's fairly broad searches that are permissible of phones without some going back with a warrant and parameters for a magistrate judge. It then really ups the ante for the initial seizure of the phone. And so what do we do with the parallels here in Griffith, where in the affidavit itself, there's no reference to ownership of a phone, to observation of use of a phone. Even of cell calls between co-conspirators or an indication that he's going to be home where the cell phone might be expected to be found at the time of the search. Well, the situation in Griffith is vastly different. I was about to ask, how many real parallels do you think there are between the Griffith setting and what we have here? Almost none. I mean, other than the fact that our affidavit doesn't specifically reference cell phones, it does reference electronic equipment. I mean, that's bizarre, isn't it? I mean, you've got an affidavit talking about pagers and telexes and it doesn't mention cell phones? I believe that the best access, the affidavit is not perfect, but that's not the issue. The issue is... I can't disagree that it should have included cell phones. It did include cell phones in attachment B, which was significant, because the reference... But you'd agree that's not optimal. I mean, that's not the way this should work. No, it shouldn't. It shouldn't work that way. The affidavit should have this type of thing described, shouldn't it? We shouldn't have this sort of, well, you know, just kidding, redefine print in attachment B. That's not the way this should work. No, but if you read the paragraph that references electronic equipment and you insert it, and what was important about it, it listed a non-exclusive list of some things that Your Honor has recognized were dated or perhaps gated at this point. Could it be, and this is not excuse by any means, but perhaps explanation, that agents are relying upon the same stock language that they have been using for years? It could very well be the reason that that, but my point is if you include cell phone, just insert cell phone into that, it would fit. Because what they were concentrating on was electronic equipment that was capable or could be used... That argument demonstrates just how easy it would have been and would be to include cell phone and to plug in cell phone, if you will. That may all be well and true, but what we're evaluating here is this warrant was presented to a magistrate judge and did that warrant in its entirety, the lengthy affidavit with long discussion of his criminal activity, the types of records that would be created, primarily financial records granted, and then combined with attachment B, which included cell phones, did it provide that magistrate with a substantial basis to find it that was probable cause of the crime? It did provide that magistrate with a substantial basis to search the cell phones for evidence of that crime. Is the government's position that if there is the allegation of a crime being committed, as long as the cell phone is listed on the attachment, that there is probable cause to believe that a cell phone will be found in a home or office, for that matter, without anything in the form of a warrant? And in the affidavit indicating that the target owns a phone, used a phone, would have the phone at that location at the anticipated time, just the commission of a crime creates a probable cause to believe that the cell phone will be found and can be seized? No, Your Honor, that's not our position. That's just the commission of a crime. But it did include, and the extensive fraudulent activities of this defendant, as well as the extensive drug trafficking conspiracy activities of this defendant, it combines with the affiant's observations about the use of electronic equipment to create, store, record, transfer documents. That's the key language. A cell phone is capable of doing all of that. And he did include his, based on his training and experience, that these types of crimes would generate records, and that those records, and it should have been included, could be stored, the ubiquity and nature of cell phone use. The fact that there was no specific reference in the affidavit that he owned cell phones. I think this is a case where you could draw a reasonable inference that this individual is likely to own and use cell phones. He ran multiple businesses from his home. He was communicating with co-defendants, Patel, there's a whole list of them, Vandegrift, the other two CSs in the affidavit. It was a reasonable inference that the magistrate could draw that he would not only possess a cell phone, it would be in his house, and that he would have evidence of it. I realize it's not the focus of either party, but we can affirm on any ground, and I'd be interested in your views on harmlessness, given the statement in the pre-trial proceedings by the prosecutor touting how important this was as a piece of evidence. Yes. If I might explain, we did not include a harmless error argument in our brief, because the brief, although it focused on the video, it did not include a harmless error argument. Mr. Goldberger preserved, he did challenge the admission of all evidence relating to the cell phones that was seized from the cell phones. It was done in a footnote, but it did preserve the issue, and we felt we could not make an argument that the admission of all of the evidence that was seized from Vetri's cell phone would be harmless beyond a reasonable doubt. We do believe strongly, however, that we could meet our burden of proving that that video, the admission of that video was seized from Vetri's cell phone. It was harmless beyond a reasonable doubt, if it's just limited to the video. And that is, this court has recognized that the government meets this standard when there's overwhelming evidence of the defendant's guilt. And in this case, there was overwhelming evidence that Mr. Vetri was involved in this murder. Look at the nature of the video alone. The video is taken 10 days after the murder, and all it really shows is that Vetri, after the fact, was aware that this individual had been killed and that it was done by shooting him. That's all it shows. There was four witnesses testified at trial about Vetri's involvement in the murder. Significantly, his friend, Eric Martia, who was not at all involved in the murder plot, the others were, Vetri told him once, he said, yeah, those are the guys, and he was pointing to Vandergrift and to Manvold, those are the guys who took care of Beau for me. Beau was all about who was killed. There was, Manvold testified about a conversation he had with Vetri. He showed him the gun that he said, whoa, have you ever killed anybody? What would it take you to do? That was Vetri. Manvold replied, money. Then he shows him a gun he stole in a burglary. The gun was used in the murder. Vetri comes to the house where Manvold and Vandergrift are living the day after the murder, and as Manvold recounts at trial, he was happy it was done. He didn't care how many times we had shot him. Patel testified, said he told Vetri the day before the murder that he was cutting him off from the pills because he was going to give all his pills to Oliver. All of the witnesses were consistent. There was also Eric Hastings. In other words, we do believe there was such overwhelming evidence that we can say that this evidence, the video evidence, was harmless beyond a reasonable doubt. You understood a challenge to all of the evidence on the cell phone coming in as being preserved. I just wanted to clarify whether you're talking about in the district court or on appeal, because as I read the brief, and I'd be interested in Mr. Goldberg's response too, but the text of the argument is entirely about the cell phone. And the footnote, footnote six says this argument focuses only upon the seizure and search of Vetri's cell phone. And then I believe that that paragraph goes on to say that we are also asserting that there was no probable cause to search his cell phones at all, and that all of the evidence should have been suppressed. Maybe I was reading more into it. But obviously there was not any specific, and I think it's telling that there wasn't any specific discussion about whether or not the other evidence was admissible. I didn't get to the good faith exception, but if I could just note, and this is where we really part ways with the Griffith decision. The good faith exception, even if you were to find... I didn't get to answer your question about Griffith, but unless you wanted to, thank you. First of all, nothing I said this morning is a withdrawal of any argument that's in our brief. That's a misconstruction. Where is any argument in your brief that challenges the introduction of anything but the cell phone? There isn't. The cell phone video. The argument is about this piece of evidence, the denial of the suppression as to this piece of evidence. So with that in mind, can you address the question then of harmlessness? I understand you can affirm on any ground, but I think the government made a conscious and wise decision not to argue harmless error. The standard here, because it's a constitutional issue, would be harmless beyond a reasonable doubt. The question is not whether there is a lot of other evidence. The question is whether this evidence, beyond a reasonable doubt, did not contribute to the verdict. The prosecutor's view in the dynamic of trial was necessarily the opposite of that, because the prosecutor made, not only in writing in the motion before trial how important this argument was, sorry, this piece of evidence was, but emphasized it in closing argument, played the video repeatedly during trial. Faces are lesion where we say it's harmless error because the prosecutor didn't emphasize it. Right. So you're taking advantage of the inverse of that. If they beat this drum and they beat it loudly, then they did so for a reason. The prosecutors put their word that this was important to their case and they wanted to use it to get over that last reasonable doubt. That's all it takes for it not to be harmless. This had to have been an enormously powerful piece of evidence. And I'm grappling with this whole concept of harmless error applicable to a piece of evidence of this explicit nature and what would have to be this power. I mean, I can only say that in my days as a prosecutor, if someone had dropped a piece of evidence like this into my lap in dousing days, I probably would have regarded it as proof of the existence of God. You'd be looking for a justification to introduce it at the trial. Yes, certainly. Are we asking with harmlessness whether the nature and amount of the other evidence in the record was so overwhelming that the jury? No reasonable jury could have reached another conclusion, even absent this evidence. And what we have here, not four, but five, including pharmacist testimony that place your clients and gives direct evidence of your client's involvement in the murder. Why isn't it overwhelming evidence with all respect? That's not the harmless error test for constitutional error. It's whether you could say the unreasonable doubt that this evidence, this evidence, the contested evidence did not contribute to the verdict. Not whether in an imaginary trial without this evidence, you would predict a conviction. And that's what I like to look at. That's a legal principle that we can easily define from the case law. We understand your position. Right. Thank you very much. Thank you very much to both of counsel. We'll take the matter under advisement and we will declare the morning over and ask the court.